THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GERALD B. ECKLES, Defendant-Appellant.

Fifth District    No. 78-370

Opinion filed April 11, 1980.—Rehearing denied May 19, 1980.

John H. Reid and Jeff M. Plesko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Lloyd Middleton, State's Attorney, of Pinckneyville (Raymond F. Buckley, Jr., and Stephen J. Maassen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mme JUSTICE SPOMER delivered the opinion of the court:

Defendant was convicted of the murder of his wife after a jury trial in the circuit court of Perry County and sentenced to an extended term of 50 years' imprisonment. On appeal, he contends (1) that he was not proven guilty beyond a reasonable doubt; (2) that he was denied a fair trial because of (a) being handcuffed during a portion of jury selection, (b) admission of prejudicial exhibits and testimony, and (c) prejudicial remarks by the prosecutor; (3) that the court erred in giving a form of verdict which improperly shifted the burden of proof regarding insanity to the defendant; and (4) that the sentence imposed was excessive.

The evidence disclosed that in the afternoon of June 11, 1977, while the defendant's wife, Darla Eckles, was at work as a waitress in the lounge of the St. Nicholas Hotel in DuQuoin, the defendant entered, drew a revolver, and fired twice at her from a distance of 5 to 10 feet as she walked toward him. After she fell to the floor, he shot her four more times, fatally wounding her, and fled. Several patrons were in the lounge when defendant entered. Two of them positively identified him as the assailant and described the occurrence in detail, testifying that no words were exchanged between defendant and his wife before the shooting, and that there appeared to be no provocation on her part.

Defendant was apprehended within an hour at his grandfather's house in Sesser, sitting on the front porch drinking beer. He appeared nervous, but conversed normally. Later, at the sheriff's office, he gave coherent, responsive answers, although denying any memory of the

shooting. His car was found in a wooded, secluded area near the Sesser city limits, some 200 yards off the road and not visible from the highway. Several .357-caliber cartridges and a box for a Colt Python revolver were recovered from the car. The gun was never found.

A review of the events preceding the occurrence is necessary. The testimony disclosed that on May 14, 1977, the defendant had so severely beaten his wife that she required medical attention. He not only threatened her life, but also the lives of her three children from a prior marriage. She then separated from him and moved into the home of her mother; she sought legal advice preparatory to filing suit for divorce. Defendant continued to threaten and harass her, all of which incidents she reported to the police.

On May 26, 1977, the mine workers' union of which defendant was a member referred him to Dr. Julius Clyne, a psychiatrist. Dr. Clyne admitted him to Memorial Hospital in Belleville for treatment for depression. He was released on June 9, 1977, at which time his condition was diagnosed as "psychotic depressive reaction, in remission." He returned to Sesser, where he resided with his parents, but he continued to threaten and harass his wife.

On the day in question defendant had awakened, read the newspaper, washed and waxed his car, and seemed to be in a good mood, according to his father. Only a half-hour before he shot his wife, he stopped at the garage of a distant relative in the area for a short visit. He appeared sober at that time, consuming only a soft drink while there. He then telephoned her at her place of employment and attempted a reconciliation. When she refused, he responded, "All right, I am going to kill you. I am going to kill the three children. I am going to kill your dad. I am going to kill the whole family." Shortly thereafter, the defendant arrived at the hotel, and the shooting occurred.

Defendant relied on the defense of insanity at the time of the commission of the offense. Dr. Clyne testified for the defense that he had diagnosed the defendant as "psychotic depressive reaction" and also noticed symptoms of paranoid schizophrenia. Upon discharge from the hospital, defendant was taking Noludar, a nonbarbiturate sedative for relief of insomnia, and Triavil, an antidepressant, for relief of depression. Dr. Clyne at that time witnessed no manifestations of antisocial personality, although the history related to him indicated that defendant had suffered mental problems while in the service, was absent without leave on several occasions, and finally accepted a year's incarceration in Leavenworth rather than a medical discharge. Defendant had been married five times; while married to his first wife, he once shot at her parents through a window of their house, causing personal injuries, as a result of which he spent five or six months as a patient in the Anna State

Hospital. After several escapes from the institution, he was eventually returned to court and sentenced to the penitentiary for a term of six years. While still on parole for that offense, he was again imprisoned, this time for approximately five years in the State of New Mexico for the crime of kidnapping. Although he released his victim unharmed, he shot and seriously wounded himself as the police were apprehending him.

While defendant was in custody on the charge in the case at bar, Dr. Clyne again examined him. He concluded that it was possible that the defendant lacked the capacity to appreciate the criminality of his conduct on June 11, 1977, and this possibility was substantially greater for him than for a normal person because of his lack of good contact with reality. On cross-examination, however, he noted that many people suffering psychotic depressive reaction could understand the nature of their acts and know the difference between right and wrong; and he believed the defendant knew the difference between right and wrong when he was released from the hospital on June 9.

Pat Hartman, a counselor at Perry County Help, whose qualifications included a master's degree in rehabilitative counseling, conferred with the defendant on May 3 and May 11, 1977, and it was her conclusion that he was unwilling to accept responsibility for his marital problems, but was basically a normal person.

Defendant's father testified that the first of many psychological problems was exhibited by his son at age 17, while he was in the army. Thereafter, he had several marital failures, the first four ending in divorce.

In rebuttal, Dr. C. E. Boyd, a psychiatrist, testified that he had examined the defendant on two occasions in 1957 and again on November 12, 1977, while he (defendant) was awaiting trial. At the earlier examination, his diagnosis was "sociopathic personality disorder antisocial type," now termed "personality disorder antisocial personality." In 1977, his diagnosis was the same, and he found no neurosis or psychosis. When given the diagnosis of Dr. Clyne of June 9 and asked whether or not, in his opinion, defendant could appreciate the criminality of his conduct on June 11 when he killed his wife, Dr. Boyd answered that defendant at that time could appreciate the difference between right and wrong.

The defendant first asserts on appeal that the evidence was insufficient to establish that he was sane beyond a reasonable doubt when he shot and killed his wife. However, the evidence taken in its entirety does not support a reasonable doubt. The psychiatric evidence was conflicting, in which case the jury's finding will not be disturbed unless it is so manifestly against the weight of evidence as to indicate that the verdict was based on passion or prejudice. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297; *People v. Lane* (1974), 23 Ill. App. 3d 287, 294-95,

319 N.E.2d 90, 96.) Nor does defendant's argument that his expert witness was more qualified than the State's expert witness raise a reasonable doubt of sanity, where the testimony conflicts. *People v. Rennert* (1977), 49 Ill. App. 3d 485, 490, 364 N.E.2d 506, 510.

When the evidence presented to the jury in the case at bar is considered, it appears that the jury concluded that the defendant's conduct manifested the capacity to appreciate the criminality of his actions. The shooting followed a beating and threats against Darla, which apparently were a result of their marital difficulties. The shooting itself was a planned, expressly deliberate act, which immediately followed a phone call during which defendant told Darla he would kill her. The witnesses who observed the shooting testified that defendant was acting in a deliberate, purposeful manner. While these facts of themselves may not be conclusive, the defendant's actions subsequent to the shooting preclude any claim that defendant did not appreciate the criminality of his actions. His expressed mission of killing Darla accomplished, he returned to his car and fled. In an apparent attempt to conceal evidence, he drove to a secluded spot outside of Sesser and hid the car behind a thatch of trees and bushes some 200 yards up a farm path. He effectively disposed of the gun; it was never found. Then he went to his grandfather's house, sat on the porch and drank beer. When arrested, he denied any knowledge of the gun. When later questioned, he gave coherent, responsive answers, although he continued to deny any knowledge of the shooting.

■■ ■ A jury may properly conclude that the defendant was sane at the time of the offense by accepting lay testimony over expert testimony. (*People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 348, 385 N.E.2d 904, 908; *People v. Spears* (1978), 63 Ill. App. 3d 510, 518, 380 N.E.2d 423, 429.) The fact that defendant took elusive measures and destroyed evidence of the crime significantly rebuts the psychiatric testimony offered by defendant, and tends to establish defendant's sanity beyond a reasonable doubt. (*People v. Ellis* (1976), 39 Ill. App. 3d 373, 374, 350 N.E.2d 328, 328; *People v. Young* (1978), 60 Ill. App. 3d 351, 353-54, 376 N.E.2d 739, 741.) This is particularly true where, as here, the psychiatric testimony was in conflict. Therefore, we cannot say that defendant's sanity was not proved beyond a reasonable doubt.

■■■ The defendant also argues that he was denied a fair trial for several reasons. He first claims error when, during voir dire examination of the first panel of potential jurors, the prosecutor said, "The law in this state does not permit a death penalty as a part of the punishment in this case." Defense counsel objected to this remark, the objection was sustained, and the panel was admonished that its function was solely to determine defendant's guilt or innocence. As defendant concedes, reversal is not

always required where the jury is informed of the possible sentences. Juries may be instructed as to the penalty for the crime charged even where, as here, the jury did not have the responsibility to fix the punishment. (*People v. Dewey* (1969), 42 Ill. 2d 148, 158, 246 N.E.2d 232, 237.) Only in those cases where probation is possible, and the jury is so advised, does error occur, and it is reversible error only if it may have influenced the jury's verdict in that case. (*People v. Burgard* (1941), 377 Ill. 322, 36 N.E.2d 558; *People v. Klapperich* (1939), 370 Ill. 588, 19 N.E.2d 579; *People v. Neeley* (1974), 18 Ill. App. 3d 287, 309 N.E.2d 725.) We conclude that the prosecutor's comments were not error and could not have influenced the jury's verdict.

■ The defendant further contends that the fact that he was briefly handcuffed in the presence of veniremen as the court was declaring a recess during voir dire also denied him a fair trial. Defendant cites and relies on *Massey v. Moore* (1954), 348 U.S. 105, 108, 99 L. Ed. 135, 138, 75 S. Ct. 145, 147; *Kennedy v. Cardwell* (6th Cir. 1973), 487 F.2d 101, 104; *United States v. Samuel* (4th Cir. 1970), 431 F.2d 610, 614; *People v. Boose* (1977), 66 Ill. 2d 261, 362 N.E.2d 303, and *In re Staley* (1977), 67 Ill. 2d 33, 364 N.E.2d 72. Those cases stand for the well-established proposition that the accused has the right to stand before the jury clothed with the physical indicia of innocence, including freedom from physical restraint except under exceptional circumstances, and we reaffirm such rule of law. However, in the case at bar, although it appears uncertain whether or not the handcuffing was viewed by the prospective jurors, the incident was brief. A four-day trial intervened between the incident complained of and the jury's deliberations. Moreover, there is no showing that any individuals who ultimately sat as jurors either witnessed the handcuffing or gave it significance. This court has recently found a brief view of defendant in handcuffs to be harmless error. (*People v. Harlan* (1979), 75 Ill. App. 3d 168, 393 N.E.2d 1203.) Furthermore, upon consideration of the entire record and the strength of the State's case against defendant, it is most improbable that this episode in any way influenced the jury's verdict, and we find it to be harmless error.

■■ Defendant also asserts that he was denied a fair trial when the trial court admitted photographs of the victim's body, and the articles of clothing she was wearing. He claims that the items had no probative value, and were offered for prejudicial purposes only. The defendant did not object to admission of the victim's clothing. In fact, defense counsel specifically stated "no objection" on their admission. Furthermore, defendant did not raise the issue in his written post-trial motion, and his oral motion was objected to by the State. On both grounds, the matter was waived. *People v. Seaberry* (1978), 63 Ill. App. 3d 718, 723, 380

N.E.2d 511, 515; *People v. Whitehead* (1966), 35 Ill. 2d 501, 503, 221 N.E.2d 256, 257.

■■ Defendant contends that in view of the fact that the State introduced testimony from several witnesses as to the victim's identity and the cause of death, and that defendant's only defense was insanity, the photographs were merely cumulative and irrelevant. The photographs accurately depicted the gunshot wounds of the victim, and they cannot be characterized as unnecessarily gruesome or gross, in light· of other photographs which have been admitted. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) When photographs are relevant to establish any fact in issue, as in the case at bar, they are admissible even though they may be of a gruesome nature. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) Furthermore, they assisted the jury in understanding the medical testimony, and are thus admissible. *People v. Jones* (1978), 62 Ill. App. 3d 443, 446-47, 379 N.E.2d 301, 304.

Nor does the fact that defendant's only defense was insanity preclude the prosecution from presenting such photographic evidence. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6), particularly where it may help to establish defendant's mental state at the time of the offense (*People v. Seaberry* (1978), 63 Ill. App. 3d 718, 722-23, 380 N.E.2d 511, 515). The photographs depicting the six gunshot wounds helped to establish the deliberateness of defendant's actions. Accordingly, the trial judge did not abuse his discretion in admitting the photographs.

■■ During trial, three of the witnesses and a prosecutor referred to the shooting of Darla as a "murder." Defendant argues that this fact also denied him a fair trial, since the categorization "usurped the function of the jury." However, it is apparent that all of the comments were inadvertent, and in context none of the comments were directed to the nature of the homicide. Instead, the comments reflected the common use of the word "murder" among laymen, and that is undoubtedly how the jurors, lay people themselves, understood the comments. Further, the defendant in no manner argued that the shooting was manslaughter or some lesser category of homicide, but relied solely on an insanity defense. It is clear the jury's function was not abridged, and defendant was not denied a fair trial.

Defendant finally asserts that he was denied a fair trial because of numerous allegedly improper and prejudicial remarks of the prosecutors during closing argument to the jury. Although defendant now complains that several erroneous comments were made, he objected to only one.

■■ ■ Generally, irregularities in the prosecutor's closing argument not objected to in the trial court (*People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Gunner* (1979), 73 Ill. App. 3d 533, 392 N.E.2d

165), as well as those not particularly set forth in the written post-trial motion (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), are deemed waived and do not require reversal. In the instant case, defendant's motion for a new trial contained only a general allegation that "the State's closing argument was inflammatory, prejudicial and inaccurate." Such contentions will be considered on appeal only if the reviewing court is able to say they were so prejudicial that defendant did not receive a fair trial or were so flagrant as to threaten the deterioration of the judicial process. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590; *People v. Smith* (1977), 53 Ill. App. 3d 395, 404, 368 N.E.2d 561, 568; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454, *appeal denied* (1976), 61 Ill. 2d 604.) At the outset, our supreme court's pronouncement in *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327, must be considered:

> "The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 29 N.E. 899.) The general atmosphere of the trial is observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld. (*City of Chicago v. Chicago Title & Trust Co.*, 331 Ill. 332, 163 N.E. 17.)"

Closing arguments will be considered in their entirety, and the record as a whole must be examined to determine if reversible error was committed in this respect. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 525, 368 N.E.2d 528, 532.) As a rule, the prosecutor is to be given a great deal of latitude in making his closing argument. *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847, 852.

■■■ In the instant case, defendant first complains of this portion of the prosecutor's argument:

> "It is time, ladies and gentlemen, that people like that who are completely unable to cope with society, as he said go to a prison. That's what you do for them. It is not your responsible [*sic*] to determine where or how much. Your responsibility is only to determine whether he is guilty or not guilty. A long time ago, a long time ago on a place called Mt. Sinah [*sic*], a man named Moses went up to the mountain and the Lord gave him the law. And you remember what it was. 'Thou shalt not kill." Didn't he. Not that you can kill if you are insane. Not that you can kill if you

don't like the way your wife keeps house. Not that you can kill if you don't like your in-laws. 'Thou shalt not kill.' And the only refinements that've been grafted on to that is what our legislature does up at Springfield when they create the so-called defense of insanity. But, it is not enough ladies and gentlemen to come in here and say, I am insane. You've got to turn me loose. Send me down to the mental hospital, but don't send me to prison.

It is a little too late for that. And it is real late for him. It's real late for him, because there has been a lot of time to send him to that mental hospital. And he didn't go. And when he did go they turned him loose. So, now he has committed the ultimate crime. He has taken a life now. He has violated the commandment. It is time now for Gerald Eckles to start paying."

The defendant made no objection to these remarks, his only objection coming after these comments:

"PROSECUTOR: Darla Eckles can't talk to you. I am talking to you for Darla. When she looks down on you, how are you going to answer her questions? Her life was snuffed out. I don't know what her age was.

DEFENSE ATTORNEY: Your Honor, I object to this appeal to the sympathy and prejudice of the jury."

The objection was overruled, and the prosecutor continued:

"PROSECUTOR: This is Darla. I don't know how old she was actually, but she was too young to die the way she did. And when you go into the jury room you will have these exhibits."

At this point, the prosecutor held up photographs of the victim which had been admitted into evidence, defense counsel objected, and the objection was sustained. We do not find this reference to Darla Eckles to be so improper as to deny defendant a fair trial. The prosecutor is entitled to comment on the deceased and the nature of the killing when such is supported by the record (*People v. Gonzales* (1968), 40 Ill. 2d 233, 239 N.E.2d 783), and he may also delve into the evils of crime (*People v. McTush* (1978), 61 Ill. App. 3d 214, 218, 377 N.E.2d 1148, 1151; *People v. Ivery* (1979), 72 Ill. App. 3d 158, 390 N.E.2d 608). Because of the evidence presented at this trial, defendant could not have been prejudiced by this remark. The photographs which were exhibited to the jury had been properly admitted into evidence; they did nothing more than exemplify the evil effects of crime, which is permissible argument.

More troubling is the prosecutor's reference to the Ten Commandments. There can be no doubt that the comment was improper. *State v. Wangberg* (1965), 272 Minn. 204, 136 N.W.2d 853.) In *Wangberg* the prosecutor attempted to capitalize on the fact that the defendant, charged with murder, was the son of a minister and as such, was bound

by the Fifth Commandment, a law higher than the law of the State of Minnesota. He also questioned whether insanity makes any difference in the eyes of God. The Minnesota Supreme Court found the comments reversible error because they told the jury to hold the minister's son to a higher standard of conduct while tending to discredit the defense of insanity. In a later case from the same jurisdiction, a similar comment on the Fifth Commandment, although improper, was held not to be reversible error. (*State v. Hanson* (1970), 286 Minn. 317, 176 N.W.2d 607.) In that case the court commented at pages 329-30:

> "The reference by the prosecution in his closing argument to the words of the Fifth Commandment, 'Thou shalt not kill,' was, at best, inappropriate. The jury in this case was not assembled to pass a moral judgment on the defendant. Its obligation was to decide whether on the evidence legally adduced in the courtroom the state had established beyond a reasonable doubt defendant's guilt of homicide as defined by our statutes. Nothing can be added to what was said in State v. Wangberg, 272 Minn. 204, 136 N.W.(2d) 853, concerning the mischief which results when jurors are urged to apply sanctions for the enforcement of divine law. Their role is limited to that of judging whether guilt of man-made criminal law is proved by evidence properly received.
>
> Nevertheless, having examined the entire argument of the prosecuting attorney in light of the opinion of this court in State v. Wangberg, *supra*, we have concluded that it does not constitute a prejudicially erroneous appeal to bias and prejudice * * *. The reference to the Fifth Commandment was very much incidental to its main thrust. We do not consider it a basis for reversal."

In the case at bar, prior to those comments by the prosecuting attorney, the defendant's attorney had argued to the jury:

> "Let this man go to a security hospital. He can get the help he needs. Don't put him in prison. Because that's not going to do him any good. That's not going to do us any good. If he is in the security hospital, he is going to be restrained, he is going to get the treatment he deserves."

■■ We believe the prosecutor's remarks relating to the insanity defense were invited by this argument of defense counsel, and they were not intended to discredit that defense. Defendant cannot invite reply to his own comments and then complain of the reply on appeal. (*People v. Norfleet* (1973), 15 Ill. App. 3d 567, 304 N.E.2d 672.) Nor were they nearly as flagrant as those in *Wangberg*. Immediately after noting the Commandment, the prosecutor recognized that Illinois law provides for the defense of insanity. In fact, that defense was the focus of much of the State's argument and of virtually all of the trial itself, and the reference to

the Fifth Commandment was merely incidental thereto. Furthermore, the prosecutor told the jury that the State had the burden to prove beyond reasonable doubt that the defendant intentionally shot and killed his wife and that at the time he did so, he was sane, and the court gave proper instructions on these issues. A similar situation was faced in *People v. Etten* (1975), 29 Ill. App. 3d 842, 847, 331 N.E.2d 270, 275, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2207, in which the supreme court noted:

> "Defendant lastly argues that the prosecutor misrepresented the law of insanity during final argument by emphasizing that defendant knew what he was doing * * *. While the assistant State's Attorney did argue that defendant knew what he was doing (which may be a factor to consider in determining whether defendant appreciated the criminality of his conduct), he also pointed out that the court would instruct the jury regarding the law and stated, in language substantially the same as the statute, what he thought the instruction would be."

The court concluded that the error was harmless. See also *People v. Vinson* (1978), 61 Ill. App. 3d 684, 689, 378 N.E.2d 348, 351.

■■ We have examined the proceedings in its entirety and find no reversible error arising from the other instances of alleged error. The comments of the State's Attorney were based upon evidence in the record and the legitimate inferences to be drawn therefrom, and thus, are not improper. (*People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537; *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) They did not mislead the jury as to what verdicts they could return (*People v. Gerecke* (1977), 45 Ill. App. 3d 510, 359 N.E.2d 1178) nor influence the verdict which actually resulted (*People v. Gambony* (1948), 402 Ill. 74, 83 N.E.2d 321). Without exception, no objection was made to them, none was alleged specifically as error in the post-trial motion; and defendant has not shown that the result of the trial would have been different had the statements not been made. The entire focus of the four-day trial and the instructions given established the possible applicability of the insanity defense. The jury judged the credibility of the witnesses, weighed their testimony, and simply did not accept defendant's evidence as creating a reasonable doubt of his guilt. The jury was instructed that the attorneys' closing arguments were not evidence and were not to be considered as anything other than closing arguments. The defendant received a fair trial, and the jury's finding will not be disturbed.

■■ The defendant next contends that the forms of verdict given to the jurors in instructions improperly shifted the burden of proof regarding insanity to the defendant. The jurors were given three forms of verdict: guilty, not guilty, and not guilty by reason of insanity. The special insanity

verdict was accompanied by the following instruction regarding the verdict, given pursuant to the provisions of section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(j)):

> "The affirmative defense of insanity has been presented during the trial of this case. A special verdict of not guilty by reason of insanity may be returned instead of a general verdict but such special verdict requires a finding by the jury that the defendant committed the acts charged but at the time of the commission of those acts the defendant was insane."

Defendant asserts that this instruction conflicts with other instructions given, which properly place the burden of proving sanity on the State, and that it improperly shifts the burden to defendant.

The same argument was rejected in *People v. Gold* (1967), 38 Ill. 2d 510, 232 N.E.2d 702. The court .in *Gold* concluded that the special instruction with regard to the verdict of not guilty by reason of insanity was not intended to affect the State's burden of proof in any way, but merely provided a differentiation between the special verdict of not guilty by reason of insanity and the general verdict of not guilty, so that the court could determine whether defendant remained insane in the former case. Accordingly, the special verdict instruction was to be considered,· not in isolation, but in conjunction with those instructions properly placing the burden of proving sanity on the State. When so considered, the special verdict form does not affect the State's burden of proof.

While the proceedings which follow a special verdict of not guilty by reason of insanity have changed since *People v. Gold* (at the time of *Gold*, the jury followed a special verdict of not guilty by reason of insanity with a statement indicating whether or not defendant had recovered from his former condition of insanity; following Public Act 80—164, §2, effective August 1, 1977, such special verdict is now followed by a hearing to determine whether the defendant is in need of mental treatment), the fact that the verdict does not alter the burden of proof remains. Therefore, *Gold* is controlling, and we find the jury was properly instructed regarding the burden of proof. The case of *People v. Penman* (1915), 271 Ill. 82, 110 N.E. 894, cited by defendant, is inapposite because in that case the jury was never instructed, as here, that to sustain the charge of murder the State had to prove beyond reasonable doubt that defendant was sane.

■■ Defendant finally assigns as error the fact that he was sentenced to an extended-term sentence of 50 years' imprisonment. He first contends that the sentencing judge was barred from applying extended-term provisions because the aggravating factors were not alleged in the information. Next, he asserts that the provisions should not have been applied where both criteria (conviction of the same or greater class felony

within 10 years, or exceptionally brutal or heinous behavior indicative of wanton cruelty) were not present. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).) In the alternative, he contends that there was insufficient evidence of exceptionally brutal or heinous behavior to justify the extended-term sentence.

This court has recently concluded that aggravating factors for sentencing need not be alleged in the indictment or information and that only one criterion for application of an extended sentence need be proved. (*People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374.) That case is controlling here. Furthermore, we believe there was ample evidence for the trial judge to conclude that the defendant's actions in shooting his wife manifested exceptionally brutal or heinous behavior indicative of wanton cruelty.

Accordingly, the defendant's conviction and sentence are hereby affirmed.

Affirmed.

JONES, P. J., and KARNS, J., concur.